1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF PUERTO RICO

3                              -oOo-

4

5    THE UNITED STATES OF AMERICA,)
                                  )
6         Plaintiff,              )  Case No. 3:14-CR-00334-JAG-SCC
                                  )
7    -vs-                         )
                                  )
8    ISRAEL BERRIOS-BERRIOS,      )
                                  )
9         Defendant.              )
     _____)

10

11

                  TRANSCRIPT OF SENTENCING HEARING
12         HELD BEFORE THE HONORABLE JAY A. GARCIA-GREGORY
       CLEMENTE RUIZ-NAZARIO U.S. COURTHOUSE, HATO REY, PUERTO RICO
13                     THURSDAY, JUNE 18, 2015
     _____

14

15                    A P P E A R A N C E S

16
     For the United States of America:
17
          Assistant U.S. Attorney Marshal D. Morgan
18
     For the Defendant:
19
          Attorney Hector Guzman-Silva
20

21

22

23

24

25

1          (PROCEEDINGS COMMENCED AT 3:28 P.M.)

2                          -oOo-

3          DEPUTY COURTROOM CLERK:  Criminal Case 2014-0334,

4   U.S.A. versus Israel Berrios-Berrios for sentencing hearing.

5   On behalf of the Government, Assistant U.S. Attorney Marshal

6   Morgan.  On behalf of the defendant, Attorney Hector

7   Guzman-Silva.  The defendant is present in court, and he's

8   being provided with the assistance of the court interpreter.

9          MR. MORGAN:  Good afternoon, Your Honor.  The United

10   States is ready to proceed.  And if we could, before

11   proceeding, handle one matter.

12          There is several -- the victims and his parents are

13   here, and it would be nice if they could be able to hear.  If

14   we could ask for some extra headphones for them?  We need

15   three.

16          THE COURT:  We have to get some headphones, I guess,

17   for them.

18          THE INTERPRETER:  I only have one.

19          DEPUTY COURTROOM CLERK:  There is only one headset.

20          THE INTERPRETER:  We can ask somebody to bring from

21   the office, maybe.

22          THE COURT:  Okay.

23          MR. MORGAN:  Are we going to be able to get a

24   third, or is that not possible?

25          THE COURT:  Are there any other headphones available?

1          THE INTERPRETER:  Not immediately, no, Your Honor.

2     I'm sorry.

3          DEPUTY COURTROOM CLERK:  Do you want to wait until we

4     get an additional set?

5          THE COURT:  Yes.  And then we'll take the status

6     conference before -- we can't, because it's at 4:00, yes.

7     Okay.

8          Well, why don't we get those headphones.  Okay?  Even

9     if I have to go myself, I will get them, if it's necessary.

10    Okay?

11         MR. GUZMAN-SILVA:  If you're going to get headphones

12    for everybody, then bring some more, because my client has both

13    family and friends here, and they should be able to hear as

14    well.

15         THE COURT:  The essential persons to have headphones

16    are the victims.

17         MR. GUZMAN-SILVA:  The victim only.

18         THE COURT:  That would be the essential person, I

19    guess.

20         MR. MORGAN:  I submit that there is more than one

21    victim in this case, Your Honor.

22         THE COURT:  Who?

23         MR. MORGAN:  We have the victim.  We have his mother.

24         THE COURT:  Well, I'm not so sure where she qualifies

25    as a victim, but okay.

1          MR. GUZMAN-SILVA:  I have no problem with the victim

2     having headphones.  If you're going to get headphones --

3          THE COURT:  If we're going to get some headphones,

4     might as well get four or five.  Okay?  This should have been

5     foreseen before this hearing.  Okay?

6          MR. GUZMAN-SILVA:  Are you going to pass this over

7     then for another case, Judge?

8          THE COURT:  Huh?

9          MR. GUZMAN-SILVA:  Are you going to go ahead and do

10    another case?

11         THE COURT:  No.  I have no other case, because I have

12    status conferences, but they are at 4:00 p.m.  Okay?  I don't

13    know if the attorneys for some of them are here.  I don't think

14    so.  We'll just have to wait.  Okay?

15         MR. GUZMAN-SILVA:  Should we sit down and wait?

16         THE COURT:  Yeah.  Why don't you sit down, and we'll

17    take a short recess.

18         Next time, please, the attorneys, when something like

19    this is going to happen, they should notify the Court.

20         MR. MORGAN:  Very well, Your Honor.

21    (Whereupon a recess was taken.)

22         THE COURT:  Okay.  Mr. Guzman, you did go through the

23    presentence investigation report with the defendant, you know,

24    and explain to him everything that is in there, you know, and

25    you're satisfied he understands the contents?

1          MR. GUZMAN-SILVA:  I am, Your Honor.

2          THE COURT:  Okay.  And then, there is a type C plea

3     in this case, you know, with a specific recommendation within a

4     sentencing range.

5          MR. GUZMAN-SILVA:  Right.

6          THE COURT:  You reserve the right to argue for 10

7     years.  The government reserves the right to argue for 12

8     years.  Okay?

9          And you have filed a sentencing memorandum and

10    certain objections to the presentence investigation report;

11    that some of them were taken care of by the probation officer.

12         MR. GUZMAN-SILVA:  Correct.

13         THE COURT:  Okay.  So we shall proceed in the sense

14    that, you know, I have to give, afford an opportunity for the

15    victim to express himself.  So I guess we should probably do

16    that first, and then we'll hear the arguments, you know, for or

17    against, you know, the high end or low end of the applicable

18    sentencing range.  Okay?

19         MR. GUZMAN-SILVA:  So just for the record, the Court

20    has accepted the type C plea.

21         THE COURT:  Yes, I have.

22         Okay.  Very well.

23         MR. MORGAN:  Okay.  Very well, Your Honor.

24         And just to begin, I want to apologize for the snafu

25    in the beginning about the headphones.  I should have

1    anticipated that ahead of time.

2            The victim has prepared a statement that, it is in

3    writing as well, and what I was suggesting, if the Court would

4    be amenable to this, is to have him, I guess, approach the

5    microphone and then read it all the way through without

6    interruption.  And then, if we need to, we can have the

7    interpreter take the same statement and read that.

8            THE COURT:  And then translate the whole thing.

9            MR. MORGAN:  That's correct, if that's okay with the

10   Court.

11           THE COURT:  Okay.  So we'll do that.

12           In the meanwhile, I guess you can probably sit down

13   with the defendant.  There is no need to be standing up at this

14   time.

15   (Whereupon the victim read his statement to the Court in a

16   non-English language.)

17           THE COURT:  Very well.

18           THE INTERPRETER:  Your Honor, I would suggest, if

19   possible, to make a certified translation of this document

20   which has been handed to me, I received a copy, to incorporate

21   it into the record in English.

22           MR. MORGAN:  There would be no objection from the

23   United States, if that's okay.

24           THE COURT:  No objection.  Okay.  Very well.  So a

25   certified translation of the statements made by the victim

1    shall be placed on the record, you know, as the official

2    translation of what he stated.  Okay?

3              Very well.  So we shall continue then with the

4    sentencing process.

5              Very well.  So I will hear Mr. Guzman's arguments

6    first, and then I will hear Mr. Morgan's.  Okay?  And then

7    finally, if Mr. Berrios wishes to speak to the, to the Court,

8    I'll hear him.  Okay?

9              MR. GUZMAN-SILVA:  Let me -- excuse me, has the Court

10   had an opportunity to read my sentencing memorandum?

11             THE COURT:  Yes, I did.

12             MR. GUZMAN-SILVA:  All right.  Then you will know

13   that --

14             THE COURT:  And there's some statements that are

15   attached to it, you know, concerning people who have known Mr.

16   Berrios, you know, throughout his life.

17             MR. GUZMAN-SILVA:  Correct.

18             THE COURT:  Okay.

19             MR. GUZMAN-SILVA:  And you will also note that there

20   are several inconsistencies with the statement that was just

21   read to the Court, and with the things that Mr. -- that EMC

22   said.

23             THE COURT:  That was stated to the ecclesiastical

24   court.

25             MR. GUZMAN-SILVA:  The church, as opposed to the

1     police.

2          So I can -- well, I suppose I should cover at least a

3     couple of points.

4          Mr. Motta claims that he was psychologically affected

5     by this, and I'm sure, to some extent, he was.  But it does

6     bring up questions.

7          If he was so psychologically affected by this, why he

8     requested and went on another cruise after this with Mr.

9     Berrios, where they slept in the same room, and no sexual

10    contact took place, why he went on another trip to Florida with

11    Mr. Berrios, where they slept in the same room, and no sexual

12    contact took place, why he decided to join the seminar where

13    Mr. Berrios was director, so that he would be in daily contact

14    with Mr. Berrios, if these interactions, completely

15    inconsistent with somebody who's been psychologically

16    traumatized by that person, and why he continued to take gifts

17    from Mr. Berrios after all the sexual contact had stopped, even

18    though he said he had absolutely no affection for him.  As he

19    told both the church and the PSR writer, that he liked him

20    because he got gifts, for no other reason.

21         So it is hard to be psychologically traumatized by

22    someone who you have no feelings for and who you continue to

23    seek contact with and accept gifts from.  I think that is

24    contained in my sentencing memorandum, but I thought at least I

25    should cover some of the inconsistencies of a reality with what

1    was read to the Court a second ago.

2            All right.  When Mr. Berrios was 14 years old, his

3    father suffered a stroke, a stroke that left him incapacitated

4    for eight years.  Mr. Berrios wanted to go finish high school

5    and then go on to college.  He could not do that, or he chose

6    not to do that.

7            He chose to go to work at the age of 14 and began to

8    help his family.  His father was the bread-earner, and he had

9    been incapacitated.  The family was without funds.

10           He left his dreams behind to go on with his education

11   and kept, and began and kept, working to support his family.

12   He made it possible for his siblings to go through college.

13   And only after, only after he finished helping his family, did

14   he then begin his own education, which culminated in his

15   education in seminary and his becoming a priest.

16           He worked -- the most he earned was in a fruit and

17   vegetable stand, where he worked and earned $135 a month.  He

18   would take that check, give it to his mother, and his mother

19   would then use that to buy the sustenance that the family

20   needed.

21           This, I submit to you, is an example of how he spent

22   the rest of his life.  There is absolutely no doubt that he

23   committed a grave mistake.  What he did with EMC was wrong.

24   EMC did not have the capacity to consent to these things, so

25   that even if he did consent, as he did, it was wrong of Father

1    Berrios to continue.

2            It happened, according to the PSR, 10 to 12 times

3    total during the entire period that they knew each other.  So

4    we are not talking about years of abuse.  We are talking about

5    a very limited period of time.  That doesn't make it right,

6    but, again, it goes to the recitation by EMC relative to the

7    emotional trauma that he suffered.

8            You know, a lot has been made of the fact that my

9    client was a priest.  And that is true.  But priests are not

10   perfect.  If priests had to be perfect, there would be no

11   priests.  There would be no clergymen of any type.

12           They all make mistakes, just like the rest of us.

13   And if we hold them to a standard of being perfect or never

14   erring, it's a simply unrealistic standard that no one can live

15   to, no one can live up to.

16           Father Berrios has done a tremendous amount of good

17   in his life.  I have, as stated in my memorandum, I have 131

18   documents from parishioners and priests attesting to his

19   character and to his good deeds.  They range the gamut that you

20   can think of.

21           He clothed the people that didn't have clothes.  He

22   found sleeping quarters for those who did not have any place to

23   sleep.  He fed people who did not have the means to get food.

24   He dealt with people involved in drugs continuously and gotten

25   many of them into treatment.

1          And to put all of this into perspective, he also gave

2     gifts to many other people:  males, females, young, old,

3     mature, immature.  He had hundreds of young people that he had

4     contact with during this time, as a priest.

5          And even though the Bishop of Caguas did an extensive

6     search for other victims, no other victim was ever found.  This

7     is one person and only one person.

8          And to give you an idea of the extent of the search,

9     the Bishop held community meetings every place where he had

10    worked, every place, brought in the parishioners and told them,

11    It is your religious duty to tell me if there has been any

12    negative contact between you or anyone you know, and at that

13    time, Father Berrios.  And not a single person came forward in

14    all of those meetings.

15         And, in other words, what I'm trying to point out to

16    the Court is that the behavior was only with this one person in

17    the instances that we have mentioned.  The rest of the youth he

18    dealt with, many of them very susceptible, as I said, people

19    addicted to drugs, people with mental health issues, not a

20    single complaint has been given against him by any of those

21    people.

22         Now, this mistake with EMC, this improper contact,

23    has cost him absolutely everything.  It's cost him his

24    priesthood.  It cost him economically, of course.  It has cost

25    him the ability to continue with the good works that he was

1    doing before.

2                It has cost him his freedom.  He's been incarcerated

3    and will continue to be incarcerated.  In short, it has cost

4    him absolutely everything he cares for and about, except his

5    family, his family, who knows him best and remains steadfast

6    and loyal to him throughout this entire process.

7                And that's important.  It's important because

8    rehabilitation -- I've been doing this for almost 40 years.

9    It's been my experience that rehabilitation depends, in a large

10   extent, to the environment that a person comes to you when he

11   leaves jail.

12               In this case, my client will come home to a nurturing

13   environment of people who love him, and that will help him

14   tremendously.  I think it's the single most important factor.

15               Can you excuse me a second, Judge?  Because I take

16   blood pressure medication.

17               THE COURT:  Okay.  Yes, of course.

18               MR. GUZMAN-SILVA:  So that he has that advantage.

19               Now, one of the things that the Court has to be aware

20   of, or has to be, has to have in its mind when it's fashioning

21   a sentence is, will this person re-offend, because you, or no

22   other judge, wants to send a person out who is then going to

23   harm others.  Well, please remember that he has only offended

24   with this one person, despite a myriad of opportunities to do

25   so.  Please remember that it was a limited amount of contact,

1    and it did not go on, as it could have gone on, through these

2    other trips that I just mentioned a second ago.  He would not

3    do it.

4            So I think you can be fairly comfortable that given

5    his environment, given the fact that it's only been one person,

6    given the fact that the contacts were limited, given the fact

7    that he had opportunities with this one person, and, again, he

8    never re-offended.  Consequently, he is very unlikely to

9    re-offend.

10           The government has agreed, did agree, to a 10 to 12

11   year sentence and a C plea.  It is inconceivable to me that the

12   government would have agreed to allow us to argue for 10 years

13   if they had the slightest doubt that he would re-offend.  If

14   they thought he was going to be a danger, they would never have

15   agreed to the plea of a possible 10 year to 12 year sentence.

16           What's, what's, what's the extra two years going to

17   do here?  There is no programs that last more than 10 years.

18   There is no -- there's nothing he can learn in 12 years that he

19   cannot learn in 10.

20           You could be cynical, I suppose, and say, Yeah, well,

21   it will keep him off the street for two additional years.

22   Sure.  But there is nothing in this record that shows that if

23   he gets out after 10, instead of 12 years, he will re-offend.

24           As a matter of fact, I would submit to you that it is

25   fairly clear from the record that he is very, very likely not

1    to re-offend.  Nobody can be a hundred percent sure.  We can't

2    do that.

3              But we can certainly look at the background and what

4    happened and make a determination, the best determination we

5    can.  I think you can do that with comfort in this case,

6    knowing that whether it's a 10 year or a 12 year sentence you

7    give him, he will not re-offend.  I submit to you that the

8    extra two years are meaningless.  They help no one.

9              I've visited federal prisons.  I don't know if you've

10   had that opportunity.  Here's what happens at a federal prison:

11             There is a center courtyard.  The majority of the

12   prisoners are in the center courtyard.  They sit there day

13   after day after day.  Some of them are playing basketball.

14   Most of them are segregated by ethnic groups, volitionally.

15   They do it themselves.

16             The Latinos sit over here.  Hispanics sit over here.

17   Afro-Americans sit over here, and so on.  And they just discuss

18   whatever's going on or stare out into space.  That's what they

19   do.  That's what I observed.

20             What is two more years of that?  How does two more

21   years of that help society?  How does two more years of that

22   help Mr. Berrios?  How does two more years of that bring

23   anymore dignity into this process or make it more valuable?

24             I submit to you that it doesn't.  And, again, I would

25   go back to this:

1        If the government had the least doubt that my client

2   was going to re-offend, if they thought he was going to

3   re-offend, they wouldn't have agreed to it, a possible 10 year

4   sentence.  They only agreed to that because they knew that it

5   was unlikely.  I'm surmising the reasoning that went into their

6   minds, but I think it's logical.

7        So, you know, I am arguing to you, I guess, for a 10

8   year sentence, which is the statutory minimum.  And I see no

9   reason that an additional two years would help anyone.

10       I have not gotten -- there is a lot of other

11  inconsistencies in the statement that was made here today by

12  Mr. Motta.  And I have not -- and some of them I think are more

13  injurious to him.

14       They're contained in my sentencing memorandum.  I'm

15  not going to say them out loud here today, but I would ask the

16  Court to consider the information relative to what he said, who

17  began all of this, who went to who, et cetera, when deciding on

18  your sentence.  So that's all I have.

19       I -- my client still has a case pending in Puerto

20  Rico courts, which is coming up next week, so I have advised

21  him not to give a statement to the Court because there is still

22  an active case pending out there.  I think he's going to follow

23  my advice, but I'm not sure.

24       I may as well cover this as a housekeeping matter,

25  and now that I'm talking.  He has a case in Aibonito.  There is

1      a trip leaving the federal jail here for Atlanta on Thursday.

2              I would like the Court to make sure that he stays

3      here so he can deal with his problems in Puerto Rico and he

4      doesn't get shipped out, this gets continued, and then he has

5      to be brought back and the whole thing has to start again.  So

6      I would ask for an order that he stay here until his case in

7      Puerto Rico is concluded.

8              Oh, one other thing, and I think this is important.

9      When I first met Father Berrios, then Father Berrios, he was

10     relatively healthy.  He had a neurological problem, which was

11     in check, by his doctor.

12             If you look at him now, you will see that one eye is

13     slowly closing, and that is because the neurological problem

14     has not been dealt with in the federal jail.  And they, in

15     fact, told him that they were not going to deal with it.

16     Whatever happens happens, number one.

17             Number two, he has glaucoma.  Apparently, the

18     glaucoma has not been properly treated, because he has now lost

19     a significant amount of vision in the eye that has glaucoma.

20             So not only has it cost him the other things that

21     I've mentioned, but also it is now costing him his sight.  I

22     know that this Court can't treat him, or perhaps order the jail

23     to -- well, I guess you could order them to give adequate

24     treatment.  But they'll do whatever they want to do.  But I

25     want the Court to understand that as well when fashioning the

1    sentence in this case.

2              THE COURT:  Okay.  And do you have a specific

3    designation for, for -- I mean, recommendations.

4              MR. GUZMAN-SILVA:  No, Your Honor.  Given the nature

5    of the offense, we are not going to make a specific

6    recommendation.

7              THE COURT:  Oh, okay.  Very well.  Okay.

8              And now I'd like to hear from the government.  Okay?

9              MR. MORGAN:  Thank you, Your Honor.

10             In all of my years in handling these cases, it's hard

11   to say whether I've heard a more insensitive defense counsel

12   allocution on behalf of his client, both in what he says today

13   before you and through his sentencing memorandum.

14             Based on his words, it's his impression that his

15   client stands before you today admitting that he is technically

16   guilty because the government could prove all of the elements

17   of the charge, but then again, I'm not really sure what his

18   ultimate goal is by pointing out certain inconsistencies

19   between what he may have said before the church court and what

20   he may have said here.  It seems to me that what he's trying to

21   do is say, This crime wasn't as bad because the defendant

22   wasn't really hurt.

23             I submit to you that the defendant stood before you

24   and says that he has dealt with suicidal tendencies.  The fact

25   that he currently lives medicated is proof positive of the fact

1    that he suffers greatly, greatly from the abuse that he

2    suffered.

3              I also suspect that the classes that he failed in

4    school were not simply because he decided not to work.  There

5    is always a direct link between one's psychosis and the abuse

6    that he suffers.

7              I don't think that seeing his mother weep at the

8    abuse of trust, the abuse of confidence that she, herself,

9    suffered when she, herself, indicates that she now feels

10   destroyed, seeing his mother be just as much as a victim that

11   he is, in certain respect.

12             And then finally, he says that, Yes, while he's a

13   minor, and he couldn't technically consent, but in this case he

14   did, nevertheless, it's sort of like coming forward and saying,

15   Yeah, you got me, but this case really isn't that bad because

16   there is some inconsistencies in what he says.

17             In addition, in general terms, it appears that in

18   both the sentencing memorandum and before the Court today, the

19   defendant seems to minimize the difference between 10 and 12

20   years and, in fact, question why the United States even offered

21   such a small range.  I think that the victim himself said it

22   perfectly when he said in Spanish:

23             (Speaking in a non-English language).

24             He had fear of being judged.  And that is, in fact,

25   exactly what is happening both here before the Court and in the

1    sentencing memorandum.  He, as a minor, who, in effect, as

2    described by the defendant himself, the defense counsel himself

3    in his sentencing memorandum, was subject to a form of human

4    trafficking.

5            Human trafficking, by all accounts, is an individual

6    who is engaging in a commercial sex act.  Now, he wasn't -- he

7    didn't plead guilty to human trafficking, so don't get me

8    wrong.  And I'm not arguing beyond the 10 to 12 years.

9            But what I see in the argument made by counsel is

10   that he consented.  We're talking about a minor who was offered

11   expensive and valuable gifts that he didn't have otherwise.

12   And yet counsel says that he somehow consented.

13           Your Honor, I submit to you that consent, by any

14   other name, was totally and completely vitiated by the

15   enticement, by the grooming that the defendant engaged in.

16           The victim said it best when he said, in effect, that

17   Mr. Berrios violated the ultimate sacrament in this case.  He

18   used information gleaned during a confession by his mother for

19   his own sexual gratification.  He used the information that Mr.

20   Motta was without a father and, as a result, was suffering from

21   depression.

22           He violated that confidence.  He used that as the

23   in-roads to a long and sorted process of grooming this

24   individual and his family into trusting him.  He, in effect,

25   used his robe, his garb, his position, to gain their trust,

1    only to then squash it.

2            The mother's statement also is very telling when she

3    said that she was convinced that allowing her son to go to

4    church functions with the defendant was better than going out

5    dancing.  In these particular cases, Your Honor, and I know

6    Your Honor has had plenty of them, 95 percent or more of those

7    who victimize victims are within the circle of trust of those

8    victims and their families.

9            Why is that?  Because it's very difficult, unless you

10   just kidnap some kid off the street and then rape them, which

11   doesn't happen that often, but you have to have the

12   opportunity, and you have to put in the time to groom that

13   individual.  And that is exactly what happened in this case.

14           The difference between 10 and 12 years, the United

15   States offered this defendant to plead to between 10 and 12

16   years for a good reason:  to protect the victim from being

17   judged.

18           Because of who this defendant is, we have more people

19   in this court, we have more people in Puerto Rico, interested

20   in what happens to this case.  To put a young person through

21   the trauma of a trial is akin to re-victimizing him.

22           10 to 12 years, the United States deemed reasonable,

23   given all of the circumstances.  And when it comes right down

24   to it, Your Honor, I submit to you that I cannot in good

25   conscience say that a case of this nature, with a defendant

1      carrying the position of trust that he did, merits a sentence

2      that is equivalent to the mandatory minimum sentence imposed by

3      Congress, which is 10 years.

4             The victim said in his allocution, or in his victim

5      statement, that when he walks out that door, he's looking to

6      start a new stage in his life, in fact, start a new life.  Your

7      Honor, the United States implores you to send him, and the

8      public, the correct message, that based on the facts of this

9      case, this case is not the equivalent of the minimum, and much

10     less, the mandatory minimum.

11            12 years is what is appropriate in this case, given

12     all of the circumstances.  It is not akin to a mandatory

13     minimum case.  And I strongly implore the Court to consider

14     imposing a sentence of 12 years.

15            Thank you very much.

16            THE COURT:  Very well.

17            So defendant will not be making any statements?

18            MR. GUZMAN-SILVA:  No.

19            THE COURT:  Very well.  I can understand, because the

20     other case -- is the other case going to go to trial, or they

21     have --

22            MR. GUZMAN-SILVA:  Your Honor, the other case is set.

23     That's why the argument struck me funny of, the United States

24     did this to -- because the other case is set for trial right

25     now in the courts of Puerto Rico.

1            THE COURT:  So it's actually set for trial.

2            MR. GUZMAN-SILVA:  Yes, sir.  I don't know that it's

3     going to go to trial.  My understanding is that it may not go

4     to trial.

5            THE COURT:  There is no plea, plea negotiations.

6            MR. GUZMAN-SILVA:  Yeah, there are.  There are

7     extensive plea negotiations.  But as I understand, technically,

8     and I may be wrong, but this is what I understand, it's set for

9     trial.

10            THE COURT:  Okay.  Very well.

11            On August 21st, 2014, the defendant, Israel

12     Berrios-Berrios, pled guilty to Count Four of the Indictment in

13     Criminal Case Number 14-00334, 334, yes, which charges a

14     violation of Title 18, U.S. Code, Section 2423(a), which is a

15     class A felony.  The November 1, "2015," edition of the United

16     States Sentencing Guidelines has been used to apply the

17     advisory guideline adjustments pursuant to the provisions of

18     Guideline Section 1B1.11(a).

19            The guideline for a Title 18, U.S. Code, Section 2423

20     offense is found in U.S. Sentencing Guideline Section

21     2G1.3(a)(3) of the guidelines.  That section provides that an

22     offense involving transportation of a minor to engage in a

23     prohibited sexual conduct has a base offense level of 28,

24     pursuant to U.S. Sentencing Guideline Section 2G1.3(a)(3).

25            Since the defendant unduly influenced a minor to

1  engage in a prohibited sexual conduct, the base offense level

2  is increased by two levels, pursuant to U.S. Sentencing

3  Guideline Section 2G1.3(b)(2), capital B.  Since the

4  defendant's offense involved the commission of a sex act or

5  sexual contact with a minor, an increase by two levels is

6  applied, pursuant to U.S. Sentencing Guideline Section

7  2G1.3(b)(4).  Moreover, since the defendant knew or should have

8  known that the victim of the offense was a vulnerable victim, a

9  two level enhancement is applied, pursuant to U.S. Sentencing

10  Guideline Section 3A1.1(b)(1).

11          Since the defendant used his position to facilitate

12  this offense, his position as, in the church, to convince the

13  defendant's victim's mother and persuade her to leave her son

14  under his supervision, to trust him, he betrayed this family's

15  trust.  They loved and respected him, as he was part of their

16  own family.  Therefore, a two-level enhancement is applied,

17  pursuant to U.S. Sentencing Guideline Section 3B1.3.

18          Since the offense of conviction is a covered sex

19  crime, and the defendant engaged in a pattern of activity

20  involving prohibited sexual conduct, the offense level should

21  be five plus the offense level determined under Chapters Two

22  and Three of the Guidelines, pursuant to U.S. Sentencing

23  Guideline Section 4B1.5(b)(1).

24          Lastly, since the defendant has demonstrated

25  acceptance of responsibility for his participation in the

1    offense, the offense level is reduced by three levels, pursuant

2    to Guideline Sections 3E1.1(a) and (b).  There are no other

3    applicable guideline adjustments.

4         Now, if we go strictly by the guidelines, based on a

5    total offense level of 38 and a criminal history category of I,

6    the guideline imprisonment range for this offense would be from

7    235 to 293 months, U.S. Guideline Section 5G1.1(c), with a fine

8    range of $25,000 to $250,000, and a supervised release term of

9    at least five years to life.

10        The Court has reviewed the advisory guideline

11   calculations and finds that the presentence investigation

12   report has adequately applied those computations.  The

13   guideline computations satisfactorily reflect the components of

14   the offense by considering its nature and circumstances.

15        Furthermore, the Court has considered the other

16   sentencing factors set forth in Title 18, U.S. Code, Section

17   3553, especially the nature and circumstances of the offense,

18   the history and characteristics of the defendant, as well as

19   the seriousness of the offense, promotion for respect for the

20   law and just punishment, and also, adequate deterrence to

21   criminal conduct.  It has also considered, you know, the

22   potential for defendant for needed educational and vocational

23   training and medical care and other correctional treatment in

24   the most effective manner.

25        As indicated in the presentence investigation report,

1    Mr. Berrios-Berrios is 59 years old.  He's a resident of

2    Naranjito, Puerto Rico, and has no dependents.  The defendant

3    completed three years in philosophy and four years in theology

4    from the Seminario Nacional Cristo Sacerdote, La Ceja, Distrito

5    de Antioquia, Columbia.

6              On June 13th, 1996, Mr. Berrios was ordained a deacon

7    for the Diocese of Caguas, Puerto Rico.  And as to Mr. Berrios'

8    employment history, he has the following:

9              On December 27, 1996, he was ordained a priest for

10   the catholic church.  In 1997, he was named Parochial Vicar for

11   the San Andres Catholic Church in Barranquitas, Puerto Rico,

12   where he served for eight months.

13             In, approximately, 1998, he was named Parochial Vicar

14   for the Santos Angeles Custodios Catholic Church in Yabucoa,

15   Puerto Rico, where he served for, approximately, eight months.

16   From 1998 to 1999, he served as Parochial Vicar for "Santo

17   Cristo de la Salud" Catholic Church in Comerio, Puerto Rico,

18   for eight months.

19             From 1999 to, approximately, 2004, he was a Parochial

20   Vicar for the San Jose Catholic Church in Aibonito, Puerto

21   Rico.  From 2004 to 2009, he was the Parish/Priest for the San

22   Jose Catholic Church in Aibonito, Puerto Rico.  And from 2009

23   to, approximately, 2013, he served as the Parish/Priest for the

24   San Andres Catholic Church and as Dean of the Dioceses of

25   Caguas' Catholic Seminary, earning $500 monthly.

1          Mr. Berrios was well known in the community of

2     Aibonito as a priest who visited his church members, who went

3     to the streets to help those overcome by drug addictions and

4     the homeless.  For this reason, on June 30, 2010, the City of

5     Aibonito acknowledged his service and adopted him as a son of

6     the city.

7          The defendant also suffers from glaucoma of his right

8     eye.  He has a neurological dysfunction, which should be taken

9     care of by Bureau of Prisons' medical personnel, and the Court

10    will make a recommendation to that effect --

11          MR. GUZMAN-SILVA:  Thank you, Judge.

12          THE COURT:  -- and high cholesterol levels and this,

13    aside from the glaucoma, the neurological condition, that

14    affects his left eye.  He has never had any mental issues.  Mr.

15    Berrios has no reported history of substance abuse.  This is

16    Mr. Berrios' first known arrest and conviction.

17          Lastly, the Court has taken into consideration the

18    elements of the offense, Mr. Berrios' participation in the

19    same.  The Court also has taken into consideration the plea

20    agreement that the parties have signed, which the Court adopts.

21    It's an 11(c)(1)(C) plea agreement, which has a specific

22    sentence recommendation that goes from 10 to 12 years.

23          And the Court has heard arguments from the

24    government, arguments for the defense, you know, with respect

25    to the position of each.  The defense argues for 10.  The

1     government argues for 12.

2             And, of course, you know, as I have already

3     indicated, the promotion for the respect of the law and also

4     the protection of the public from further crimes as well, and

5     especially, you know, the issue of deterrence and punishment.

6     And the Court notes that this plea agreement stipulates, you

7     know, considerations of punishment and deterrence.

8             The Court will also take into consideration what the

9     victim has stated here in open court.  It has been a statement

10    read in Spanish, and the Court has ordered the certified

11    translation of that statement to form part of the record in

12    this court.  The Court acknowledges that the victim was deeply

13    affected, you know, by what happened, and it has left scars,

14    both in his body and in his soul, which need healing, and also

15    needs, you know, further spiritual orientation.

16            So the Court will accept the plea, as I have

17    indicated, and will sentence the defendant accordingly.  Taking

18    into consideration what I have seen here, also, you know, as

19    well as certain statements, Mr. Berrios' history, personal

20    history and characteristics, you know, as well as all of the

21    other sentencing factors that I have already mentioned, it is

22    the judgment of this Court that Mr. Israel Berrios-Berrios will

23    be committed to the custody of the Bureau of Prisons to be in

24    prison for a term of 132 months.

25            The Court will make no designation at this time.

1    However, it wishes to try for the Bureau of Prisons to see if

2    it can, he can be designated to a facility where he can obtain

3    all necessary medical treatment, as well as any other type of

4    psychological treatment that may be necessary, you know, for

5    what happened.

6            And also, the Court would like for defendant to be

7    afforded all opportunities for educational enhancement, as well

8    as having access to, you know, whatever spiritual counseling

9    there may be at the prison where he is designated, as well as

10   his access to any activities that have to do with the ministry

11   that so far he has conducted, in the sense that the Court

12   acknowledges that he cannot perform, you know, certain

13   functions as a priest because of what the bishop has

14   indicated.  However, a priest is a priest forever.

15           And, you know, in cases of emergency, the Court

16   acknowledges that the priest can always give the absolution to

17   someone who's dying, and he can also perform the rite of

18   baptism.  So the Court would like for Mr. Berrios, if at all

19   possible, you know, to be placed in a position, you know,

20   taking into account his safety and security, that, where he can

21   help other inmates, you know, to cope with their situation.

22           Upon release from -- and also, that he be medically

23   treated, as I have already indicated.  He has certain

24   neurological conditions, as well as his glaucoma, the high

25   cholesterol levels.  Therefore, he has to be medically

1    evaluated, and he has to be given adequate medication for those

2    conditions.

3         Upon release from confinement, the defendant shall be

4    placed on a supervised release for a term of 10 years under the

5    following terms and conditions:

6         The defendant shall not commit another federal, state

7    or local crime and shall observe the standard conditions of

8    supervised release recommended by the U.S. Sentencing

9    Commission and adopted by this Court.

10        Defendant shall not unlawfully possess controlled

11    substances.  Defendant shall refrain from possessing firearms,

12    destructive devices and other deadly weapons.  Defendant shall

13    undergo a sex-offense-specific evaluation and/or participate in

14    a sex offender treatment and/or mental health treatment program

15    arranged by the probation officer.

16        He shall abide by all rules, requirements and

17    conditions of the sex offender treatment program, including

18    submission to testing, such as polygraph and/or any other

19    testing available at the time of his release.  He shall waive

20    his right of confidentiality in any records for mental health

21    assessment and treatment, and sign any necessary release form

22    required to obtain the records imposed as a consequence of this

23    judgment to allow the probation officer to review defendant's

24    course of treatment and progress with the treatment provider.

25        Defendant shall be required to submit to an initial

1    polygraph evaluation and subsequent maintenance testing

2    intervals to be determined by the probation office to assist in

3    treatment planning and case monitoring and as a means to ensure

4    that he's in compliance with the requirements of his

5    supervision or treatment program.  The defendant will be

6    required to contribute to the costs of services rendered, by

7    means of co-payment, based on his ability to pay or

8    availability of third-party payment.

9            The defendant shall not engage in a specified

10   occupation, business or profession bearing a reasonable direct

11   relationship to the conduct constituting the offense.

12   Specifically, the defendant shall not work with children under

13   the age of 18, or hold a job that gives him authority over

14   potential victims, gives him access to vulnerable populations

15   or places him in a setting near a school or playground.

16           Any employment must be notified in advance, and the

17   probation officer will make an assessment of the job placement

18   and set employment restrictions based on the *Sex Offender*

19   *Management Procedures Manual*.  The defendant shall consent to

20   third-party disclosure to any employer or potential employer.

21           The defendant shall not reside, be in the company,

22   date or socialize with a child or children below the ages of

23   18, unless previously approved by the probation officer and a

24   third-party risk assessment has been duly signed.

25           The defendant shall not have any personal contact

1   with the victim or any minors under the age of 18 through mail,

2   letters, telephone, communication, audio or visual computer,

3   electronic devices, visits, social networking sites or third

4   parties, unless approved in advance by the U.S. Probation

5   Officer.  The only exception in this condition relies in the

6   incidental contact in normal commercial life with minors.

7          The defendant shall submit to a search of his person,

8   property, house, residence, vehicle, papers, computer or other

9   electronic communication or media, and effects (as designed in

10   Title 18, U.S. Code, Section 1030(e)(1), to search at anytime,

11   with or without a warrant, by the probation officer, and if

12   necessary, with the assistance of any other law enforcement

13   officer (in the lawful discharge of the supervision functions

14   of the probation officer) with reasonable suspicion concerning

15   unlawful conduct or a violation of a condition of probation or

16   supervised release.

17          The probation officer may seize any electronic

18   device, which will be subject to further forensic investigation

19   or analysis.  Failure to submit to such a search and seizure

20   may be grounds for revocation.

21          The defendant shall warn any other residents or

22   occupants that their premises may be subject to search pursuant

23   to this condition.

24          The defendant shall comply with the requirements of

25   the Sex Offender Registration and Notification Act, as directed

1    by the probation officer, the Bureau of Prisons or any state,

2    U.S. Territory or Indian tribe sex offender registration agency

3    in which he or she resides, works, is a student, carries on a

4    vacation or was convicted of a qualifying offense.

5            Having considered Mr. Berrios' financial condition, a

6    fine will not be imposed.  However, the special monetary

7    assessment in the amount of $100 must be imposed as required by

8    law.

9            Now, in your plea agreement, you have waived the

10   right to appeal, provided I sentence you in accordance with the

11   plea agreement, which I have done so.  So if you should file a

12   notice of appeal, most likely, the Court of Appeals will

13   enforce that waiver.

14           However, if you still wish to file a notice of

15   appeal, with exceptions, it has to be filed within 14 days of

16   judgment being entered in your case.  If you're unable to pay

17   the cost of an appeal, you may apply for leave to appeal in

18   forma pauperis.  If you so request, the Clerk of the Court will

19   prepare and file notice of appeal on your behalf.

20           The Court directs that the transcript of the

21   sentencing proceedings be forwarded to the Sentencing

22   Commission, U.S. Bureau of Prisons, as well as probation,

23   within 30 days.

24           The government has a request to make?

25           MR. MORGAN:  We do, Your Honor.  We move to dismiss

1    all remaining counts.

2          THE COURT:  All remaining counts against this

3    defendant are hereby dismissed.

4          Mr. Berrios, you cannot imagine the pain that I am

5    really feeling at this time.  You know, it's very hard for me

6    to have to sentence priests of a catholic church, or any other

7    minister for that purpose, which I have done before.  Okay?

8          However, you know, we know that, you know, the

9    catholic church is a hospital of sinners, if we can say so.

10   We're men with frailties, you know.  And it so happens,

11   apparently you fell, for that reason, at that time, even though

12   you should have known better, you know, given your education,

13   your standing, you know, and the trust that this family had

14   placed on you.

15         You heard what the victim said here.  You know, it

16   seems to me that he was psychologically impacted.  I know that,

17   most probably, you are at peace right now with your conscience

18   because you have probably gone through the sacrament of

19   reconciliation.  Okay?

20         Still, you know, that there's a remnant of guilt that

21   has to be paid here, or afterwards, you know, when we go to the

22   next life.  Okay?  I would ask from you, you know, if it's

23   possible, you know, for you to pray, pray, but pray intensely,

24   you know, for the victim and his family, you know, where you

25   are.

1          I know that the good works that you will be doing

2    will also be a form of prayer, you know, that through the

3    communion of saints will go to the victim and his family.  We

4    are all in this humanity club.  Okay?  So whatever we do

5    affects the others.  You know, better than I do, what I am

6    talking about.  Okay?

7          And to the victim, which I don't see the victim here,

8    apparently he left, he said he wanted to go out the door and

9    try to forget, well, you know, if there is any way that he can

10   be reached, you know, I do sympathize with what he's feeling.

11   It's something that, it's very deep.

12         It's going to take some time.  His affected life, you

13   know, with respect to other persons, will be always impacted

14   because you can never, like, get away from those images, you

15   know, that usually recur.  We have a brain that stores things,

16   you know, and sometimes they come back and haunt you.  Okay?

17   And that is reality.  Okay?

18         However, taking into consideration the reading of

19   today, which is our Father, okay, especially when at the end it

20   says, Forgive them, forgive others, you know, the Lord expects

21   us to forgive other people in order for him to forgive us, I

22   would tell him that if he releases, you know, himself through

23   that forgiveness, things will go better for him.  Okay?  I'm

24   not saying anything else.

25         And I wish that, you know, to Father Berrios, I wish

1    that your time within prison can be effectively used, you know,

2    trying to, as you have done always.  And I took that into

3    consideration in my sentence, you know.  I read this, and I

4    know that you have a good record, you know.

5           But simply, I cannot ignore the factor of deterrence,

6    you know, and the deep-seated impact that this had, you know,

7    upon the victim.  As I heard the victim here, I know there

8    might be some inconsistencies one way or the other, but it's a

9    deep psychological thing.

10          In any event, I hope that, you know, things can be

11   resolved in time, you know.  Each one can pursue his own life,

12   you know, and doing good, help the other person, as well as the

13   other persons around him.

14          And one last thing.  Father, remember me in your

15   prayers because this is not an easy job.

16          And I know that, you know, the same way that our Lord

17   was crucified, you know, you are going to undergo, you know, a

18   lot of pain and suffering.  And if you are reconciled with the

19   good Lord, you know, that will help us all, you know, to do

20   what we have to do, which is try to be better than we are in

21   the future.  Okay?  I guess that's all I have to say.

22          And your counsel indicated in his sentencing

23   memorandum that, of course, it affects you a lot because, as a

24   priest, you wanted to do certain things.  But you can still do

25   a lot of good things, you know, where you are.  Okay?

```
1              I hope that everything can be sorted out for the

2    victim, and he be able to go ahead with his life.  I believe

3    that he can do so, you know, with, of course, the help of God.

4              Anything else?

5              MR. GUZMAN-SILVA:  I have nothing further.

6              THE COURT:  Very well.

7              MR. MORGAN:  Nothing from the United States.  Thank

8    you.

9              MR. GUZMAN-SILVA:  Thank you, Judge.

10              THE COURT:  Okay.

11              (PROCEEDINGS CONCLUDED AT 5:12 P.M.)

12                         -oOo-

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    UNITED STATES DISTRICT COURT )
                                   )  ss.
 2    DISTRICT OF PUERTO RICO      )

 3

 4                        REPORTER'S CERTIFICATE

 5

 6            I, CINDY LEE BROWN, do hereby certify that the

 7    above and foregoing, consisting of the preceding 36 pages,

 8    constitutes a true and accurate transcription of my

 9    stenographic notes and is a full, true and complete transcript

10    of the proceedings to the best of my ability.

11            Dated this 22nd day of July, 2015.

12

13

14                               /s/ Cindy Lee Brown
                                 _____
15                               CINDY LEE BROWN, Federal
                                 Official Court Reporter
16                               150 Carlos Chardon, Room 150
                                 San Juan, PR  00918
17                               (775) 722-9061

18

19

20

21

22

23

24

25
```